# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 14, 2013 Session

## STATE OF TENNESSEE v. HENRY WAYNE RUSSELL

**Direct Appeal from the Criminal Court of Davidson County**
**No. 2007-C-2066A    Monte Watkins, Judge**

---

**No. M2013-00166-CCA-R3-CD - Filed April 29, 2014**

---

A Davidson County Grand Jury returned an indictment against Defendant, Henry Wayne Russell, charging him in Counts One, Three, and Five with rape; and in Counts Two, Four, and Six with statutory rape by an authority figure. After a jury trial, Defendant was found guilty as charged in the indictment. The trial court merged the convictions in Count Two with Count One; Count Four with Count Three; and Count Six with Count Five. The trial court imposed a sentence of fifteen years for each count of rape as a Range II offender for a total effective sentence of thirty years. On appeal, Defendant argues that: (1) the evidence was insufficient to support his convictions for statutory rape by an authority figure; (2) the trial court erred by denying his motion under Tenn. Rule Evid. 412 to allow evidence of C.L.'s sexual behavior; (3) the trial court erred by advising Defendant that the State would be permitted to cross-examine him concerning his prior felony drug convictions; (4) the trial court erred by allowing a forensic social worker to testify concerning the victim's medical history; (5) the trial court erred in refusing to instruct the jury on the lesser-included offense of attempted rape; and (6) the trial court erred in imposing consecutive sentencing. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Manuel Benjamin Russ, Nashville, Tennessee, for the appellant, Henry Wayne Russell.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background

In accordance with the policy of this Court, we will refer to the minor victim by the victim's initials. C.L. testified that she was born in October 1992, and she began living with her foster mother when she was nine years old. They lived at two different residences in Nashville. At some point, C.L.'s foster mother began dating Defendant, and he would sometimes spend the night at the foster mother's residence. C.L. was twelve years old when she first met Defendant. C.L. testified that she considered Defendant an "authority figure" over her because when her foster mother was not present "or just if we was all out somewhere and [Defendant] told me to do something, I was expected to do it."

From the evening of February 22, 2007, until the morning of February 23, 2007, C.L.'s foster mother left Defendant in charge of her two sons and C.L., who was fourteen at the time, while the foster mother went to work. C.L. testified:

> [The foster mother] had left the house and I had - - me and her two sons were sharing a room, and I was asleep. And then [Defendant] came into my room and he woke me up, and he led me into [the foster mother's] bedroom.
>
> And he told me to take off my clothes. And I stood there for a minute. And then he told me to take off my clothes again. And I took off my clothes. And then he sat on the bed and unbuttoned his pants and unzipped his pants.
>
> Then he told me to perform oral sex on him. I said no. And he told me again, and so I did it. And after that, he told me to lay on top of him, and he performed oral sex on me while I performed oral sex on him.

C.L. testified that Defendant's tongue and fingers touched her vagina. She said that this continued for three to five minutes until Defendant's cell phone rang. When Defendant answered the phone, C.L. gathered her clothes and left the room.

C.L. testified that on the morning of February 23, 2007, her foster mother arrived home from work and questioned her about whether anyone had touched her in an inappropriate manner. C.L. told her foster mother that Defendant had made her perform oral sex on him. C.L.'s foster mother then asked her the color of Defendant's boxer shorts. After C.L.'s foster mother confronted Defendant, she asked C.L. to come into the room and repeat to Defendant what she said had happened. Defendant claimed that C.L. was lying and "didn't know what [she] was talking about." C.L. testified that approximately five minutes

later, her foster mother took her to Our Kids Clinic for an examination. She had not showered or bathed from the time of the sexual activity until the examination. C.L. testified that the individuals at the clinic questioned her about what happened. C.L. said that she was sent to another foster home after she left the clinic. She was later interviewed on two occasions by a man and a woman. C.L. initially told them that the sexual activity with Defendant occurred one time. She eventually told them about other incidents.

C.L. testified that sexual activity occurred with Defendant on three other occasions prior to the night of February 22-23, 2007. She said that the first instance occurred at her foster mother's home on Murfreesboro Road. C.L. testified:

> [Defendant] came into my room. The boys were outside playing, and I was in a room watching TV. And [Defendant] told me to come here. And he pulled out his private part and he told me to get on my knees and perform oral sex on him.

C.L. indicated that she did not want to perform oral sex on Defendant; however, he told her that she would be taken away from her foster mother if she did not perform the act. C.L. then performed oral sex on Defendant while he stood in the doorway with his hand on the back of her head pushing it down. She said that she performed oral sex on Defendant until he ejaculated.

C.L. testified that the second time sexual activity occurred with Defendant was when Defendant picked her up after school. He was supposed to take her home but they drove to the Taco Bell near Hickory Hollow Mall to get some food. C.L. testified that after receiving the food, Defendant pulled around to the parking lot of the Taco Bell and told her to give him oral sex. C.L. refused but Defendant again told her to perform oral sex on him, and C.L. complied. C.L. testified that she performed oral sex on Defendant for approximately three minutes. He was in the driver's seat of the truck, and C.L. was in the passenger's seat. C.L. testified that Defendant's pants were unbuttoned and unzipped, and he had one hand on the back of C.L.'s head pushing it down while she was performing oral sex on him.

C.L. later told the daughter of her foster mother's friend that she did not like Defendant. When the girl asked why, C.L. responded: "Because he makes me give him head." The girl told C.L. that they should tell someone what happened. However C.L. testified that she told the girl that she would get in trouble and be taken away from her foster mother. The girl agreed not to say anything until C.L. was ready to reveal the information.

C.L. testified that the third incident of sexual contact with Defendant occurred at the home Defendant shared with his sister. C.L. had spent the night at the residence with Defendant's niece. C.L. testified that as she walked out of the shower and into the room to get dressed, Defendant opened the door and asked what she was doing. She told Defendant that she was getting dressed, and he then told her to give him oral sex. C.L. testified that she said, "I don't like doing this[,]" and Defendant said, "It won't take that long." She then performed oral sex on Defendant, and he ejaculated into the towel that she had been using and left the room. C.L. again testified that while she was performing oral sex on Defendant, he had his hand on the back of her head pushing it down. She said that at the time, everyone else in the residence was downstairs.

C.L. testified that she never engaged in any sexual activities with Defendant while he was sleeping, and she never approached him in a sexual manner.

C.L.'s foster mother testified that C.L. began living with her when C.L. was ten years old, and she remained C.L.'s foster mother for approximately four years. Prior to the time of the offenses, she had planned to adopt C.L. C.L.'s foster mother testified that she met Defendant in 2002, and they began dating shortly thereafter. Their relationship lasted for four or five years. C.L.'s foster mother testified that C.L. met Defendant approximately a year and a half after the foster mother began dating Defendant. C.L. and Defendant seemed to have a good and appropriate relationship. C.L.'s foster mother did not notice any conflicts between the two. She said that Defendant spent at least one night a week at her residence.

C.L.'s foster mother testified that on the night of February 22, 2007, until the morning of February 23, 2007, she was working for a home health company caring for an elderly patient. She also worked full time for CarMax. C.L.'s foster mother testified that when she worked at night for the home health company, her mother usually cared for C.L. and the foster mother's two other children. When her mother could not care for the children, Defendant would stay with them at night. The foster mother did not consider Defendant to be C.L.'s caretaker or supervisor when the foster mother was around.

C.L.'s foster mother testified that Defendant picked C.L. up from a hair appointment on one occasion in Hermitage. She said that it took a while for Defendant and C.L. to return home, so she called Defendant and asked where they were. Defendant indicated that C.L. had gone to Taco Bell with him. C.L.'s foster mother testified that Defendant and C.L. arrived home approximately fifteen to twenty minutes later with food from Taco Bell.

C.L.'s foster mother testified that on February 22, 2007, she left for the home health job at approximately 10:30 p.m. Her two children were asleep, and C.L. was almost asleep. C.L.'s foster mother testified that there were no adults present at the residence when she left

and that Defendant was supposed to arrived later to stay the night with them. She thought that he arrived at the house at approximately 3:00 a.m. on February 23, 2007, because she spoke with him by cell phone. C.L.'s foster mother testified that she had been calling Defendant "all night" because she wanted someone there with the children, but she had not received any response.

C.L.'s foster mother testified that during the time that she was trying to reach Defendant, she had a conversation with Keela Hatchett concerning C.L. During the conversation with Ms. Hatchett, C.L.'s foster mother received some information that caused her to question C.L. the following morning when the foster mother arrived home between 7:00 and 7:15 a.m. C.L.'s foster mother testified that she asked C.L. if "anything had been going on that shouldn't be with an adult." C.L. replied, "No." C.L.'s foster mother continued to question her about the matter until C.L. said, "Yes." C.L. then told her that Defendant had "licked" her. C.L.'s foster mother assumed Defendant had licked C.L. in her private area. She asked C.L. if she had urinated or washed since Defendant licked her, and C.L. said, "No." C.L.'s foster mother told her to put some clothes over her pajamas so that she could be taken to a hospital.

While C.L. was getting dressed, C.L.'s foster mother walked down the hall to her bedroom where Defendant was sleeping and told him what C.L. had disclosed to her. Concerning Defendant's response, the foster mother testified:

> He was, like, "What?" He was confused. And he was, like "Okay." He got up and went to the restroom and he had his clothes on and he came out. And then he asked [C.L.] why she said that or whatever. And then he said, "Don't you know that we can go to jail? We can all go to jail?" or something like that or "I can go to jail," or something like that.

C.L.'s foster mother testified that Defendant denied any sexual activity with C.L. and said that she was lying. However, Defendant later told her that C.L. "come on to him" and that "he had licked his fingers and began fondling [C.L.'s ] vagina because she was dry[.]"

C.L.'s foster mother called C.L.'s mentor with the Department of Children's Services (DCS), who told the foster mother to take C.L. to Our Kids Clinic. C.L.'s foster mother had also asked Defendant to go to the clinic for his mouth to be swabbed to prove his innocence. Defendant then drove to the clinic separately and arrived shortly after C.L. and her foster mother. C.L.'s foster mother testified that on the drive to the clinic, C.L. told her that she and Defendant had "69'd," which to the foster mother implied that Defendant and C.L. were performing oral sex on each other at the same time. C.L.'s foster mother noted that

Defendant was fond of the "69" position. After they arrived at the clinic, C.L.'s foster mother informed the staff that Defendant had licked C.L., who was then examined.

C.L.'s foster mother testified that C.L. immediately went to another foster home after the examination. The decision was made by C.L.'s foster mother and the DCS worker. C.L.'s foster mother testified that C.L. had spent the night at the home of Defendant's sister on two or more occasions. She noted that C.L. told her that Defendant had made statements to her that if she told about the sexual abuse, she would lose her foster mother.

C.L.'s foster mother testified that she was later contacted by Detective David Zoccola with the Metropolitan Nashville Police Department. She told him that C.L. indicated that Defendant had asked C.L. to perform oral sex on him. C.L.'s foster mother testified that she continued her relationship with Defendant for approximately one year after the allegations. She identified phone records from Defendant's cell phone number which reflected calls placed between her and Defendant from February 22, 2007, until the early morning hours of February 23, 2007. One of the calls was answered at 2:59 a.m. on February 23, 2007. Prior to that call, all of the calls to Defendant went unanswered or to his voice mail. When C.L.'s foster mother spoke to Defendant at 2:59 a.m., he sounded inebriated. She asked Defendant what time he arrived at her residence, and Defendant indicated that he had just arrived. He also said that the children were asleep.

C.L.'s foster mother testified that she had not witnessed any conflict between C.L. and Defendant, and C.L. had never seemed jealous of her relationship with Defendant. C.L.'s foster mother said that she never indicated to C.L. that she would not adopt C.L. if the foster mother continued her relationship with Defendant.

On cross-examination, C.L.'s foster mother testified that the phone records also documented four telephone calls between her and Defendant between the hours of 2:00 a.m. and 3:00 a.m. in addition to the call at 2:59 a.m. She also agreed that the call at 2:59 a.m. was from Defendant. C.L.'s foster mother testified that Defendant eventually told her that there was sexual contact between him and C.L. and that C.L. initiated the contact. She admitted that she did not consider C.L. to be a truthful person, and DCS, police, and the district attorney's office were aware of her opinion. C.L.'s foster mother did not recall Defendant ever being asked to pick up C.L. from school. She said that when C.L. stayed overnight at Defendant's sister's house, Defendant was not living there at the time.

C.L.'s foster mother was not aware of any occasion that C.L. went to Hickory Hollow Mall with Defendant, and she thought that they stopped at the Taco Bell on Murfreesboro Road the day that he picked her up in Hermitage from a hair appointment. She testified that while C.L. was living with her, C.L. had problems with "lying, fabricating stories." She also

had "a lot of emotional and attachment issues." C.L.'s foster mother testified that C.L. was not on medication at the time but had "lots of therapy and counseling."

Lisa Dupree, a forensic social worker at the Our Kids Center in Nashville General Hospital, testified that C.L. was examined at the center on February 23, 2007. C.L. reported to Lorraine Gray, who was no longer employed at the center at the time of trial, that Defendant had put his mouth on her "private parts." C.L. indicated that Defendant had "swiped his hands by her genital area, but did not touch in her genital area with his hands[.]" Ms. Dupree testified that C.L. also said that approximately two months earlier, Defendant asked her to put her mouth on his private parts. C.L. then disclosed the conduct to the daughter of her foster mother's friend. Ms. Dupree testified that C.L. indicated that her last menstrual cycle ended two days prior to the exam. There was some blood noted during the physical exam. Ms. Gray also documented that C.L. indicated that Defendant told C.L., "Don't do this, you don't want to leave don't go telling nobody this, you'll have to leave[.]"

Holly Gallion, a nurse practitioner with Our Kids Center, testified that she conducted a medical examination of C.L. in February of 2007. According to the report, the sexual contact between Defendant and C.L. occurred at approximately 3:00 a.m. She examined C.L. within five to six hours of that contact. Since there were allegation of oral sex, Ms. Gallion collected a rape kit from C.L. that consisted of swabs of C.L.'s genital area "to look for specifically saliva oral secretions." Ms. Gallion testified that she based her examination on information that Ms. Gray obtained from C.L. She noted that C.L. had described having her period a few days earlier, and Ms. Gallion noticed a little bit of bleeding. She determined that a "scant" amount of blood was coming from C.L.'s cervix, but there was no internal trauma. Ms. Gallion described C.L.'s physical examination as normal and that the exam neither confirmed nor denied the possibility of any type of sexual contact. However, given the history provided by C.L. Ms. Gallion did not expect to see any type of physical evidence to confirm the sexual assault.

Special Agent Charles Hardy, a forensic scientist with the Tennessee Bureau of Investigation (TBI) assigned to the serology and DNA unit, testified that he analyzed evidence from the rape kit collected from C.L. The results of the swabs from C.L.'s vaginal area "revealed the presence of alpha-amylase, which indicates the presence of saliva." The DNA profile that he obtained from the swabs matched that of C.L. Special Agent Hardy noted that the swab could have contained C.L.'s skin cells, which could account for the finding of C.L.'s DNA profile.

Detective David Zoccola of the Metropolitan Nashville Police Department was assigned to investigate C.L.'s case through a DCS referral from Peggy Nunn. He testified that an interview of C.L. was conducted on February 28, 2007, with Latoya Clark, a forensic

interviewer from the Child Advocacy Center. Detective Zoccola was not present for the interview but it was recorded. Concerning the interview Detective Zoccola testified:

> I would have been furnished with a copy of that interview where the child disclosed whatever information there was to disclose. And then I would have been furnished with either verbally what happened at that first interview and then eventually would have gotten a typed copy and a DVD or tape of that interview. It would have involved me talking to [C.L.'s] foster mom and then starting the process of investigating the allegations.

Detective Zoccola testified that he interviewed Defendant on March 9, 2007, at Defendant's place of business, a barbershop located at 8th Avenue and Wedgewood in Nashville. He said that Defendant agreed to talk with him, and the interview was recorded. Defendant was aware of the allegations made by C.L., and Detective Zoccola explained to him exactly what C.L. alleged had occurred on February 22-23, 2007. In the recording Defendant explained his relationship with C.L. He said that they got along well, and he never disciplined her. Defendant told Detective Zoccola that C.L. considered him to be an authority figure, someone that she would talk to when in trouble, and someone that she would confide in. Defendant also referred to himself as "a friend, a father figure, someone in an authoritative position."

In the interview, Defendant initially said that he did not touch C.L. After speaking with Detective Zoccola for more than an hour, Defendant maintained that C.L.'s allegations were false and that he was not guilty of "any type of sexual advancement towards her." When Detective Zoccola asked if C.L. had made any sexual advancement toward him, Defendant without hesitation replied, "Yes."

Defendant told Detective Zoccola that on the night of February 22-23, 2007, he stopped at a Jack-in-the-Box before going to C.L.'s foster mother's house. He ate the food, and then went to bed. Defendant said that he had been drinking and became sick. He went to the bathroom and vomited and then went into the kitchen to get some water to rinse his mouth. Defendant claimed that he went back to bed and woke up sometime later to find C.L. performing oral sex on him. At first, Defendant thought that he was dreaming, but when he realized what was happening, he told C.L. to go back to her room. Defendant said that when he asked C.L. what she was doing, "she just kind of shrugged her shoulders, like nonchalant." Defendant admitted that he was intoxicated that night.

Defendant said that the contact with C.L. occurred only one time. Later in the interview he explained that when he woke up C.L. was not wearing any clothes. When Detective Zoccola asked Defendant what he was wearing and whether C.L. had to remove

or manipulate his underwear to access his penis Defendant said that he was wearing his boxer shorts. When questioned again about what C.L. was wearing Defendant said that "[s]he had on - she might have had on a shirt, but she - once again, I told you when I had touched her person[], being her vaginal area, that's when I really came to, and it was like, this is more vivid than what it really is - is this is not a dream." When Detective Zoccola repeatedly told Defendant that he needed to tell everything that happened, Defendant responded:

> Once I had laid down to go to sleep, like I said, she, uh - whenever time she came in there, you know, I was, in the dream I was having oral sex - um, I was receiving oral sex, and - I went to touch her, but noticed that it was dry, so, being that it was dry, I did one of those common things that either a man or a woman would do, and basically, I took and - basically, I did like that, [licked his hand] and I touched her, and when I - that's when I really just awoke, and was like, hold up - what's going on.

Defendant told Detective Zoccola that there was no further talking, kissing, fondling, or removal of each other's clothing, or any other sexual contact between him and C.L. Detective Zoccola later spoke with Defendant about giving a DNA sample to compare to anything found on the swabs taken from C.L.'s body. He informed Defendant that he did not have to give the samples and that he was free to speak with an attorney before giving them. Detective Zoccola also explained how the swabs from C.L.'s vaginal area might show the presence of Defendant's saliva. Defendant replied, "But then - I know- I know I didn't stick my fingers in her, but me touching my mouth and touching her vagina - that can transfer saliva right there."

Based on some discrepancies between C.L.'s interview and Defendant's interview, Detective Zoccola interviewed C.L. on March 14, 2007. Peggy Nunn from DCS was also present when he interviewed C.L. at the Child Advocacy Center. Initially, Ms. Nunn interviewed C.L. alone and emphasized the need for C.L. to be honest with her. When asked if the sexual abuse had occurred on any previous occasions, C.L. said that the incident on February 22-23, 2007, was "the first time." Ms. Nunn then asked C.L. if anything had "ever been going on that led up to this," C.L. replied, "Well, not really, but one time before he asked me to put my mouth on his private part, but I didn't do it."

Ms. Nunn then asked C.L. again about the incident that occurred on February 22-23, 2007. C.L. told Ms. Nunn that the incident occurred at approximately 3:00 a.m. She was in the bedroom asleep with her foster brothers when Defendant walked in and told her to "come here." C.L. said that Defendant took her into the other bedroom and told her to lie down. He then removed her pants and underwear and placed his mouth on her "private part." C.L. said that she tried to scoot back, but every time she did so, Defendant pulled her closer.

Defendant instructed her to stop scooting back, and then his phone began ringing. C.L. said that Defendant did not answer until the third time that the phone rang. C.L. then picked up her clothes and left. C.L. told Ms. Nunn, "And he was like, where you going?" Then C.L. told him that she was going back to her room, Defendant "was like, man, just forget you. Go on."

C.L. eventually told Ms. Nunn that Defendant asked her if she wanted to "sixty-nine?" C.L. said that she asked Defendant what the term meant, and he told her that it was when a girl and a boy perform oral sex on each other at the same time. Ms. Nunn told C.L. that Detective Zoccola had interviewed Defendant and that his story was different than hers. When asked again if any sexual behavior had previously occurred with Defendant, C.L. responded, "Not that I can remember." When asked what she thought Defendant would say, C.L. said that Defendant would say that she came on to him in order to keep himself out of trouble.

Detective Zoccola then joined Ms. Nunn and C.L. in the interview room and asked if C.L. had any questions for him. C.L. asked if Defendant "admitted to doing it." Detective Zoccola then told C.L. that Defendant had told him about a different kind of activity, and he told C.L. that he could not help her unless she was completely honest with him. He told C.L. that Defendant claimed that she came into the bedroom and performed oral sex on him while he was sleeping. However, C.L. insisted that Defendant was untruthful and that he had asked her previously to perform oral sex on him but she refused. C.L. told Detective Zoccola that the request occurred at Defendant's house one day after he had picked her up from school while she was waiting for her foster mother to pick her up. C.L. denied performing oral sex on anyone. Detective Zoccola explained to C.L. that there were problems with her case because things were so different, and he could not understand why Defendant admitted to the different sexual activity when it would still get him into trouble. C.L. insisted that although Defendant asked her to "sixty-nine" with him, she did not comply.

Detective Zoccola again told C.L. that he wanted her to be one-hundred percent honest and to tell the truth. C.L. then asked to speak with Detective Zoccola alone. She told him that on the night of February 22-23, 2007, Defendant walked into her bedroom where she and her foster brothers were sleeping and woke her up. He took her into the other bedroom, placed her on the bed, and over her objections, began to perform oral sex on her. C.L. said that Defendant's cell phone rang, and he stopped to look at it but did not answer. He continued performing oral sex on C.L. and the phone rang again. Defendant looked at the phone but did not answer and returned his attention to C.L. C.L. told Detective Zoccola that when she resisted Defendant, he forced her to perform oral sex on him as she sat on the edge of the bed. When the cell phone rang a third time, Defendant answered. C.L. then picked up her clothes and returned to her room.

-10-

Detective Zoccola told C.L. that if she performed oral sex on Defendant any other times, then she should tell him. C.L. finally said, "It has happened." When asked how many times she had performed oral sex on Defendant, C.L. replied, "Three." C.L. told Detective Zoccola that the first incident occurred near the beginning of the school year in 2006 at her foster mother's house while her foster mother was at work. She had just gotten out of the shower and Defendant was waiting in her room. C.L. said that Defendant told her to "come here," and he forced her to perform oral sex on him as he touched her chest. The second incident occurred during the second semester of school in Defendant's truck in the parking lot at the Hickory Hollow Mall. C.L. said that Defendant asked her to "do it," and she said no, but when he told her again to "do it," she complied. Defendant then drove her home. A third incident occurred at Defendant's house after Christmas break in January of 2007.

Tekiyah Cooper testified on behalf of Defendant. She previously dated Defendant, and she remained in contact with his mother. She also spoke with Defendant during his incarceration in Kentucky. Ms. Cooper testified that she was also familiar with C.L. through Ms. Cooper's employment with Corrections Corporation of America at the minimum security jail in Nashville. Ms. Cooper testified that she met the victim when C.L. was an inmate in the "female building" under Ms. Cooper's supervision. She and C.L. would have in-depth conversations while C.L. was incarcerated. Concerning C.L.'s character for truthfulness, Ms. Cooper testified:

> I believe that in the beginning she wasn't as truthful with me, because she didn't know me. But once she got to know that I required the truth, she would be more truthful with me. So, in the beginning if she lied to me she would receive sanctions. But, after that once she got to know who I am and how I like things, if I asked her a question I believe she will tell me the truth.

Patricia Terrell testified that she was employed as a guidance counselor at the Margaret Allen Middle School in 2006-2007. C.L. was one of her former students. Ms. Terrell testified that she interacted with C.L. on an "as-need basis." She estimated that she spoke with C.L. at least fifteen to twenty times. Concerning C.L.'s character for truthfulness, Ms. Terrell testified:

> Well, I had incidents - - it was some incidents where there was some truth not told; whether it would be a parent conference, I believe, I had with the guardian at the time, regarding, you know, work ethic, or different things like that, or just general things - - a trip, I believe, she told me she took that she did not take. So, it was things like that.

## II. Analysis

### A. *Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence for his convictions of statutory rape by an authority figure. When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Tenn. Code Ann. 39-13-532 provides:

(a)     Statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant or the defendant by the victim when:

(1)     the victim is at least thirteen (13) but less than eighteen (18) years of age;

(2)     the defendant is at least four (4) years older than the victim; and

(3)     the defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual penetration; or

-12-

(4)     the defendant had, at he time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact.

Regarding a position of trust, the Tennessee Supreme Court has stated:

The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust *does not depend on the length or formality of the relationship, but upon the nature of the relationship.* Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

*State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996) (emphasis added).

In *State v. Margaret L. Holt*, No. E2010-02128-CCA-R3-CD, 2012 WL 826523, *16 (Tenn. Crim. App. Mar. 13, 2012), this court noted:

The statute regarding statutory rape by an authority figure does not require that a defendant used his or her position of authority to *force* the sexual penetration; instead, the statute states only that the defendant used his or her power to *accomplish* the sexual penetration. *See State v. Bryan Dale Farmer*, No. M2007-01553-CCA-R3-CD, 2008 WL 3843847, at *7 (Tenn. Crim. App., at Nashville, Aug. 18, 2008) (stating that the defendant used his position as a teacher or coach to accomplish the offense of sexual battery by an authority figure), *perm. app. denied*, (Tenn. March 2, 2009). Accordingly, if the evidence shows that a defendant used his or her position to cultivate an improper relationship with the victim and to bring about or bring to completion sexual penetration with the victim, then this evidence is sufficient to support the conviction for statutory rape by an authority figure. *See id.* at *8.

Defendant contends that the evidence was insufficient to support his convictions for statutory rape by an authority figure because the State failed to show that Defendant "possessed any 'parental or custodial authority'" over C.L. Defendant further contends that the State failed to show that even if Defendant had "parental or custodial authority" over C.L., that he used "this 'parental or custodial authority' in order 'to accomplish the sexual penetration' as the statute required." We disagree.

Although C.L. testified as to four incidents of sexual contact with Defendant, the State elected to proceed on three of those incidents. Viewing the evidence in a light most

-13-

favorable to the State, the proof showed that Defendant and C.L.'s foster mother were dating, and C.L's foster mother had planned to adopt her. C.L. testified that she considered Defendant an "authority figure" over her because when her foster mother was not present "or just if we was all out somewhere and [Defendant] told me to do something, I was expected to do it." C.L.'s foster mother acknowledged that when her mother could not care for C.L. and the other children, Defendant would stay with them at night. However, C.L.'s foster mother did not consider Defendant to be C.L.'s caretaker or supervisor when the foster mother was present. During his interview with Detective Zoccola, Defendant said that C.L. considered him to be an authority figure, someone that she would talk to when in trouble, and someone that she would confide in. Defendant also referred to himself as "a friend, a father figure, someone in an authoritative position."

During each of the three incidents in this case, C.L. was in Defendant's care. C.L. testified that the first incident of sexual contact with Defendant occurred in Defendant's truck after he had picked her up after school. Defendant was supposed to take C.L. home, but he drove her to the Taco Bell near Hickory Hollow Mall to buy some food. After receiving the food, Defendant pulled into the parking lot and told C.L. to perform oral sex on him, and C.L. complied.

The second incident of sexual contact between Defendant and C.L. occurred at the home Defendant shared with his sister. C.L. had spent the night at the residence with Defendant's niece. C.L. testified that as she walked out of the shower and into the room to get dressed, Defendant opened the door and asked what she was doing. He then told her to give him oral sex. When C.L. told Defendant, "I don't like doing this[,]" Defendant said, "It won't take that long." C.L. then performed oral sex on Defendant, and he ejaculated into the towel that she had been using.

During the third incident that occurred sometime during February 22-23, 2007, C.L.'s foster mother left Defendant in charge of her two sons and C.L., who was fourteen at the time, while the foster mother went to work. C.L. testified that Defendant came into the room that she shared with her two foster brothers and woke her up. He then led her into the foster mother's bedroom and told her to remove her clothing. C.L. stood there for a moment, and Defendant again told her to remove her clothing. C.L. took off her clothes, and Defendant sat on the bed and unbuttoned his pants and unzipped his pants. C.L. testified that Defendant told her to perform oral sex on him, and she said, "No." Defendant again told her to perform oral sex on him, and she complied. After that, Defendant told her to lay on top of him, and he performed oral sex on her while she performed oral sex on him. C.L. testified that Defendant's tongue and fingers touched her vagina. She said that this continued for three to five minutes until Defendant's cell phone rang. When Defendant answered the phone, C.L. gathered her clothes and left the room. At trial, C.L. testified that she had removed her

clothes "[b]ecause [Defendant] told me to. And he used to tell me that if I told anybody, that I would be taken away from [her foster mother]."

At some point, C.L. told a friend that she did not like Defendant. When the friend asked why, C.L. responded: "Because he makes me give him head." When the friend told C.L. that she should tell someone what happened, C.L. said that she would get in trouble and be taken away from her foster mother.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for statutory rape by an authority figure. As pointed out by the State, Defendant used his position of authority to cultivate an improper relationship with C.L. Defendant had, at the time of the offenses, parental or custodial authority over C.L. and used the authority to accomplish the sexual penetration as the statute required. Defendant is not entitled to relief on this issue.

### B.      Denial of Defendant's Rule 412 Motion

Defendant argues that the trial court erred in denying his motion to admit evidence of C.L.'s prior sexual behavior under Rule 412 of the Tennessee Rules of Evidence. More specifically, he asserts that the trial court should have allowed testimony that C.L. dressed provocatively in front of Defendant and that she attempted to hug him on one occasion. Defendant also contends that evidence of C.L.'s prior sexual behavior toward other males and evidence of her prior knowledge of sexual matters should have been admitted. Finally, Defendant argues that because statutory rape by an authority figure is not one of the enumerated offenses covered by Tenn. R. Evid. 412, the rape shield law, the trial court should have admitted evidence of C.L.'s prior sexual behavior.

Tennessee Rule of Evidence 412 governs the admissibility of evidence about a sex crime victim's prior sexual acts. It is a rule of relevance, *see State v. Brown*, 29 S.W.3d 427, 430 (Tenn. 2000), and we will not overturn a trial court's Rule 412 ruling absent an abuse of discretion. *State v. Sheline*, 955 S.W.2d 42, 46 (Tenn. 1997). Rule 412 provides, in pertinent part, as follows:

>  (c)      Specific instances of conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
>
>    (1)      Required by the Tennessee or United States Constitution, or

(2)    Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or

(3)    If the sexual behavior was with the accused, on the issue of consent, or

(4)    If the sexual behavior was with persons other than the accused,

        (i)    to rebut or explain scientific or medical evidence, or

        (ii)    to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or

        (iii)    to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c).

Even if one of the above considerations is satisfied, the trial court must nevertheless conclude that the probative value of the evidence outweighs its unfair prejudice to the victim. *See id.* 412(d)(4). "As with other evidentiary rulings, the admissibility of the evidence [pursuant to Rule 412] rests in the discretion of the trial court." *Sheline,* 955 S.W.2d at 46.

Our supreme court has stated,

Although "[t]he right to present witnesses is of critical importance . . . it is not absolute. In appropriate cases, the right must yield to other legitimate interests

-16-

in the criminal trial process." Specifically, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."

*Brown*, 29 S.W.3d at 432 (Tenn. 2000) (quoting *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

In a pre-trial hearing, Marcie Austin testified that she previously owned a company called Realistic Interventions and had twenty-one years of psychology and counseling experience. Although she was not licensed, Ms. Austin was qualified as an expert in the field of children's sexual issues. Ms. Austin testified that her company provided "in-home interventions, such as stabilization and privacy situations, preservation services, reunification services, adoption studies, home studies, supervised therapeutic visits, parenting assessments. Just a number of things." Ms. Austin testified that she worked closely with the Department of Children's Services (DCS), and she began working with C.L. when C.L. was nine or ten years old and worked with her for an approximate total of seven years. She said that C.L. came in for "therapeutic, supervised therapeutic visits with her maternal grandmother[.]" Ms. Austin specifically noted that she did not conduct any psychological tests with C.L.

Concerning her observations of C.L., Ms. Austin testified that supervised therapeutic visits with C.L. stopped because C.L.'s maternal grandmother decided that she did not want to follow through with the visits. After C.L. began living with her foster mother, Ms. Austin followed her as a "mentor" for a year. Ms. Austin testified that C.L. had a history of abuse and neglect by her family members. Concerning C.L.'s behavior, Ms. Austin testified:

Within the first week of knowing [C.L.], [she] was placed at [the foster mother's] house, her first foster home, she was witnessed humping her body on [a] neighborhood boy. From that point on there [were] constant issues with her at school doing inappropriate things, sexually and behaviorally. This has gone on, and on, and on. There is a very strong history of - - it comes to a point where I realized, in working with her, the best I could do was try to help, kind of, restructure her thinking of what she was trying to function on behaviorally from what she (unintelligible) because it is very difficult to get the truth out of [C.L.]. And I'm sorry [C.L.] (unintelligible) I will say that on a personal level I love her as a child dearly, but I will say I cannot believe anything that comes out of her mouth. She is the first child in my twenty-one years that I've worked with that I would say that about. So I cannot be a good witness to the court to prosecute anyone that has been alleged to do anything to her because of the very strong history, and the acting out, and the familial

history, too. [C.L.] needs help. She's going to need help for many, many years. I don't know that [C.L.] will ever function totally appropriately as an adult[], what we consider appropriately in society.

On cross-examination, Ms. Austin testified that the "humping" of little boys by C.L. occurred when C.L. was nine or ten years old. The allegations involving the present case occurred when C.L. was fourteen years old. Ms. Austin testified that she had no particular knowledge or information of any sexual behavior involving C.L. that occurred within a seventy-two hour time frame on February 23, 2007. However, Ms. Austin noted that C.L. dressed provocatively at nine or ten years old and that she had "absolutely no boundaries physically or mentally." Ms. Austin testified that other teenagers told her that C.L. had sex "with boys in the bathrooms and stuff at school" when she was fourteen to fifteen years old. She said that C.L. had been physically abused in one of her foster homes. Ms. Austin felt that C.L. should be tested for "sociopathic behaviors," and she said that it was very difficult for C.L. to tell the truth.

On redirect examination, Ms. Austin testified to the following concerning prior incidents of sexual behavior by C.L.:

Dressing provocatively; approaching men in inappropriate manners, which means, like, taking your body and touching them, not necessarily humping them in front of me, but no boundaries. Like, you would be a man standing there, and her come up and be as close to you as that she's touching your knee and your leg. Putting her hands on your chest your hair, and, you know, sexual acting out playfully that's very - - could be considered, you know, iffy-like if the person didn't know her, if that makes sense. But by the trained professional you know that that's not appropriate behavio[]r.

Kisha Cox, Assistant Principal at I.T. Creswell, Arts Magnet Middle School, testified that she met C.L. when Ms. Cox was a sixth grade teacher at Wharton Middle School. Concerning C.L.'s behavior at school, Ms. Cox testified:

The first incident, that I can remember, I caught [C.L.] in the second floor restroom, tongue kissing another male student. And I, also, contacted [C.L.'s foster mother] when this incident occurred. This is when she was a sixth grader.

Another incident is, one day I was sitting at my desk - - and I always kept [C.L.] in close proximity of me because of her promiscuous behavior.

* * *

And so I was sitting at my desk and she was talking about the genitalia areas of her foster mother's oldest son. And I, kind of, eavesdropped and listened to the conversation. And she said she had saw him in the restroom and he had a big genitalia area. And so, after I heard it, I asked [C.L.], you know, "Why are you having these conversations in the classroom?" And she didn't see anything wrong with those types of conversations.

Ms. Cox noted that C.L. would frequently "present herself in a sexual manner to the young men" in Ms. Cox's classroom. Parents called Ms. Cox and asked her to keep C.L. away from their child. Concerning C.L.'s truthfulness, Ms. Cox testified:

I observed, in our - - my personal conversations with [C.L.], [C.L.] was not truthful about the incidents that I even witnessed with my own eyes. She had a way of being creative with the truth. Even if you saw her commit the act with your own eyes she had a way of painting a totally different picture in which you saw [sic]. And so, therefore, it was like pulling teeth to get the truth out of [C.L.]. And only when I called [C.L.'s foster mother] is when the truth would start surfacing, slowly but surely. But it was a task getting the truth out [of] her, even when I witnessed and heard these incidents.

Ms. Cox testified that all of the incidents occurred before February 23, 2007, when C.L. was twelve years old and in the sixth grade.

On cross-examination, Ms. Cox testified that C.L. initiated the incident of french kissing with a boy in the bathroom. She said that the boy did not like it and reported the incident to her. C.L. told Ms. Cox that she liked the boy and wanted to kiss him. Ms. Cox testified that C.L. had never reported that she had been raped or sexually molested. She agreed that sexual behavior among girls thirteen and fourteen years old was not unusual. Ms. Cox testified that C.L. had a "wide knowledge of sexual activities" at the age of twelve.

C.L.'s foster mother testified that she became C.L.'s foster parent on April 17, 2003. Concerning C.L.'s sexual behavior, C.L.'s foster mother testified that C.L. saw her youngest son when he was approximately three years old in the bathroom. C.L. then went to school and talked about "how big his penis was and how he was all hard[.]" The foster mother also caught C.L. putting a tattoo on her friend's bottom. C.L.'s foster mother testified that while C.L. was attending St. Vincent de Paul Catholic School, she told the foster mother that her grandmother had raped her. C.L. was approximately ten years old at the time. She also told other children at school about the incident. C.L.'s foster mother testified:

-19-

She told me that she and her grandmother were laying in the bed, and  - - she said she don't [sic] sleep in panties, so her grandmother was rubbing on her [private area].  And the only thing that stopped her from doing it was someone knocked on her door.

C.L.'s foster mother testified that she was called to St. Vincent's School for an emergency meeting with the principal and two other parents in August of 2003.  The individuals were concerned because C.L. was "telling them that she had been raped over the summer and that she had come on her period."  She said that the other parents wanted to remove their children from the school because they were concerned that C.L. was "a little more [sexually] advanced than their children."  C.L.'s foster mother later learned that C.L. was not truthful about being raped.  She testified that on one occasion,  she saw C.L. at a friend's house "all crawled up on" an older man that C.L. did not know.  C.L.'s foster mother also said that C.L. had an old cell phone that she had been pretending to talk on for two days while at the friend's house, and she made the phone ring. The phone was dead when the foster mother took possession of it.

On cross-examination, C.L.'s foster mother testified that she had no knowledge of C.L. being involved in any type of sexual activity within seventy-two hours of the incident with Defendant.

At the Rule 412 hearing, Defendant presented no proof of C.L.'s report that she had also been molested by her grandfather, or that she had made sexual advances toward a man named "Mark" at a New Year's gathering.

In denying Defendant's 412 motion, the trial court made the following findings:

During the suppression hearing in the instant case, the Court heard testimony that a previous report had been made regarding allegations of sexual abuse by her maternal grandfather on or about January 26, 2001.  The Court also heard evidence that the alleged victim has demonstrated inappropriate sexual behavior and issues with truthfulness.

In the instant case, the defendant seeks to introduce the evidence regarding the alleged victim's sexual behavior to challenge her credibility and prior sexual knowledge.  However, the Court finds that the probative value of the evidence does not outweigh its unfair prejudice to C.L.

\* \* \*

The Court heard the arguments of respective counsel and reviewed relevant case law. Applying the above legal standard, the Court finds that the defendant has complied with the procedural requirements of Tennessee Rules Evidence 412(d). The Court also finds that the Tenn. R. Evid. 412 is a rule of exclusion. Therefore, the evidence of prior sexual abuse and sexual encounters are not admissible. The defendant's motion for introduction of Tenn. R. Evid. 412 evidence is DENIED.

Defendant filed a subsequent motion to reconsider the Rule 412 motion. The trial court denied the motion to reconsider and found:

In the instant case, the defendant seeks to introduce the evidence regarding the alleged victim's sexual behavior to challenge her credibility and prior sexual knowledge . However, the Court finds that the probative value of the evidence does not outweigh its unfair prejudice to C.L.

During the suppression hearing in the instant case, the Court heard testimony from Marcie Austin, Kesha [sic] Cox, and [C.L.'s] foster mother regarding the alleged victim's previous sexual behavior and credibility. The alleged victim's previous sexual behavior activity took place several years before the alleged incident.

Therefore, the Court finds that the evidence of prior sexual abuse and sexual encounters are not admissible. The defendant's motion for introduction of Tenn. R. Evid. 412 evidence is once again denied.

Later on, during trial, Defendant sought to admit testimony by C.L.'s foster mother that C.L., on one occasion, walked into a room in front of Defendant wearing "a spaghetti strap type little nightgown and her breasts were exposed at the top." She then attempted to approach Defendant and give him a hug. C.L.'s foster mother also testified that on another occasion, C.L. "had on some pants that I told her several times not to wear anymore where her butt was kind of hanging out and she bent over [near Defendant]." The trial court excluded the testimony finding that it was "getting into some 412 issues."

We hold that the trial court committed no error in excluding the evidence that Defendant sought to admit. As pointed out by the State, none of the instances of sexual behavior reported by the witnesses resemble the allegation by Defendant that C.L. performed oral sex on him. Nor does it resemble the acts of fellatio as alleged by C.L. C.L.'s provocative nature of wearing clothing and her behavior with other children several years before the present offenses is not relevant to the issue of Defendant's guilt or innocence in

raping C.L. *See State v. Douglass Leon Lyle*, No. E2012-00468-CCA-R3-CD, 2013 WL 1281857 (Tenn. Crim. App. Mar. 28, 2013). Defendant is not entitled to relief on this issue.

Defendant further contends that the trial court erred in admitting the evidence because Tenn. R. Evid. 412 is not applicable to the offense of statutory rape by an authority figure. We agree. Tenn. R. Evid. 412 provides:

> Notwithstanding any other provision of law, in a criminal trial, preliminary hearing, deposition, or other proceeding in which a person is accused of an offense under Tenn. Code Ann. §§ 39-13-502 [aggravated rape], 39-13-503 [rape], 39-13-504 [aggravated sexual battery], 39-13-505 [sexual battery], 39-13-507 [spousal sexual offenses], 39-13-522 [rape of a child], 39-15-302 [incest], 39-13-506 [statutory rape], 39-13-527 [sexual battery by an authority figure], 39-13-528 [solicitation of minors for sexual acts], or the attempt to commit any such offense. . .

Even though Rule 412 is not applicable to the offense of statutory rape by an authority figure, any error in not admitting the evidence was harmless. Evidence of consent as proven by C.L.'s sexual history would be irrelevant. Defendant argues that he "presented the jury with the defense that this sexual contact [with C.L.] was consensual and was, therefore, neither Rape, nor was it Statutory Rape by an Authority Figure." However, as pointed out by the State, consent is not a defense to statutory rape. In *State v. Roland R. Smith*, No. M2004-01457-CCA-R3-CD, 2005 WL 1541874 (Tenn. Crim. App. June 29, 2005), this Court stated: "The purpose of the crime of statutory rape is to punish persons old enough to know better from taking sexual advantage of those deemed too young to effectively consent." *Id*. at *11, overruled on other grounds by *State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). Consent is not a defense to statutory rape. *State v. McKnight*, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994). Moreover, we have already determined that the evidence was not relevant to the issue of Defendant's guilt or innocence in raping C.L. Defendant is not entitled to relief on this issue.

### C.    *Impeachment with Prior Felony Drug Convictions*

Defendant next argues that the trial court improperly allowed Defendant's prior felony drug convictions to be used as impeachment. Defendant cites *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003), for the proposition that drug crimes do not involve dishonesty or false statement, and he asserts that the trial court "applied an incorrect legal standard when making its ruling" and that the error "prejudiced his defense." The State concedes that the trial court erred by ruling that Defendant could be impeached with the prior felony drug convictions but maintains that the error was harmless. We agree with the State.

On May 29, 2009, the State filed a notice of intent to impeach Defendant with the following prior felony convictions: (1) felon in possession of a handgun (September 4, 2003); (2) possession of a controlled substance with intent to sell or deliver (November 6, 2003); (3) possession of cocaine (February 16, 1996); (4) sale of cocaine (September 29, 1994); and (5) possession of cocaine (January 12, 1994). It was also noted by the State that Defendant had pending federal drug charges for which he was arrested while on bond for the offenses in the present case.

Concerning Defendant's prior felony convictions, the trial court found:

And I did read *State v. Waller*, a case involving one charge of counterfeit drug sale, and he was - - the Court had ruled that his prior drug convictions were admissible, but it was harmless error in this particular case.

I also read *State v. Walker*, where it was a somewhat similar matter, where a person was on trial for drugs and had prior drug convictions and the Trial Court allowed them and, of course, that matter was reversed. And that's because the prior convictions were of a similar nature.

In this particular case, the prior convictions before this Court are not of a similar nature. They involve felony possession of a handgun, possession of a controlled substance with intent, and whatever the federal offense was, some kind of federal drug offense, all of which would require sentences of a year or more. And this Court believes that they are admissible should the defendant take the witness stand.

The trial court then noted that the convictions that were more than ten years old were time barred.

Under Tennessee Rule of Evidence 609, prior crimes may be used to attack a witness's credibility under certain circumstances. The crime itself must be punishable by death or imprisonment in excess of one year or involve dishonesty or false statement. Tenn. R. Evid. 609(a)(2). If the witness to be impeached is a criminal defendant, the State must give written notice of its intent to use the prior convictions. Tenn. R. Evid. 609(a)(3). Furthermore, for criminal defendants, the trial court "upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." *Id*. The trial court must make this ruling prior to the defendant's testimony. *Id*. This particular balancing test is applied to convictions which are not stale. *See* Tenn. R. Evid. 609(b). A trial court's decisions regarding the admissibility of prior convictions are reviewed for an abuse of discretion. *Waller*, 118 S.W.3d at 371.

In *State v. Waller*, the Tennessee Supreme Court rejected the contention that prior drug convictions involve dishonesty or false statement within the meaning of the Rule. *Waller*, 118 S.W.3d at 372. The Court concluded that "prior felony drug convictions are, at best, only slightly probative of [the defendant's] credibility." *Id*. at 373. Because the convictions in *Waller* had "some relevance" to credibility, the Court went on to analyze the similarity of the offenses to the charged crimes, concluding that their substantial similarity was prejudicial and the admission of the evidence was error. *Waller*, 118 S.W.3d at 373-74. Concerning this issue, the Supreme Court made the following findings:

In our view, Waller's prior convictions do not involve dishonesty or false statement as contemplated by Rule 609. Waller's three prior convictions are for possession of a controlled substance for resale, sale of a controlled substance, and facilitation of sale of a controlled substance. The trial court based its finding that these felony drug convictions involve dishonesty upon the illegality of the possession of a controlled substance. We are unwilling to hold that every conviction for an illegal act is indicative of dishonesty. Accepting the trial court's reasoning "would preclude any principled differentiation among crimes of varying impact on witness veracity." *State v. Zaehringer*, 325 N.W.2d 754, 757 (Iowa 1982); *see also Gregory v. State*, 616 A.2d 1198, 1204 (Del. 1992) (rejecting reasoning similar to that applied by the trial court in the present case). Under the trial court's rationale, virtually all convictions for crimes committed knowingly or intentionally would be admissible for impeachment purposes. We decline to read Rule 609 in such a manner.

The offenses for which Waller has been convicted do not comport with the plain meaning of "dishonesty." The statutory elements of these offenses do not require that the controlled substance to be sold or possessed in a manner that involves deceit or fraud. *See [State v.] Walker*, 29 S.W.3d [885, 891 (Tenn. Crim. App. 1999)] (stating that "the evidence relating to the elements of the crime is to be considered in questioning the offense's relevance to dishonesty, not the general circumstances or environment within which the offense was committed"); see also *United States v. Lewis*, 626 F.2d 940, 946 (D.C. Cir. 1980) (interpreting Rule 609 of the Federal Rules of Evidence to require that the crime involve dishonesty or false statement as an element of the statutory offense); *Gregory*, 616 A.2d at 1204 (concluding that the elements of the crime of possession of a controlled substance with intent to deliver "require no proof of conduct involving lying, deceiving, cheating, stealing or defrauding"); *Zaehringer*, 325 N.W.2d at 756 (holding that the

elements of the delivery of marijuana offense do not involve "deceit, fraud, cheating, or stealing").

*Waller*, 118 S.W.3d at 371-72 (footnotes omitted).

As pointed out by the State, the three convictions to be considered in the present case were for felony possession of a handgun, possession of a controlled substance with intent to sell or deliver, and a federal drug conviction, none of which involved an element of dishonesty. Therefore, the trial court erred by (1) failing to make a finding of probative value over prejudicial effect; and (2) ruling that the convictions not involving dishonesty could be used to impeach Defendant's credibility if he chose to testify.

Regardless, the admission of prior convictions whose probative value is outweighed by the danger of unfair prejudice is subject to harmless error analysis. *Waller*, 118 S.W.3d at 374. An error by the trial court does not require relief unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). In *Waller*, the defendant's prior convictions were similar in nature to the offense for which he was charged at trial. Regardless, the Supreme Court found the error to be harmless:

We must next consider whether the error in this case affirmatively or more probably than not affected the judgment to Waller's prejudice. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); [*State v.*] *Galmore*, 994 S.W.2d [120, 125 (Tenn. 1999)]. Waller is not entitled to relief if he was not prejudiced by the error. *State v. Taylor*, 993 S.W.2d 33, 35 (Tenn. 1999).

Waller presented no evidence at trial, and he failed to make an offer of proof as to his proposed testimony. *See Galmore*, 994 S.W.2d at 125 (holding that an offer of proof is not required to preserve a claim of an erroneous ruling on admissibility for review but concluding that it may be the only way to demonstrate prejudice). He also has presented no argument on appeal concerning the substance of his contemplated testimony. At trial, the State presented the testimony of two police officers who observed Waller sell the counterfeit substance. This evidence against Waller is overwhelming and uncontroverted. Consequently, Waller has failed to demonstrate that he was prejudiced by the trial court's erroneous ruling. We hold, therefore, that the trial court's error in ruling that Waller's prior felony drug convictions would be admissible for impeachment purposes was harmless. *See Galmore*, 994 S.W.2d at 125; *Taylor*, 993 S.W.2d at 35.

In this case, as in *Waller*, although the admission of the evidence was in error, its admission did not more probably than not affect the judgment. Tenn. R. App. P. 36(b). Defendant made no offer of proof as to his proposed testimony at trial, and he offers no argument on appeal concerning the substance of any testimony. Moreover, as argued by the State, Defendant concedes that his version of the facts, and his denial of any wrongdoing were "raised through the playing of his pre-trial statement to Detective Zoccola[.]" We conclude that admission of the convictions was in error, however, that error was harmless.

*D.      Testimony by a Forensic Social Worker Regarding C.L.'s Medical History*

Defendant argues that the trial court erred by allowing Lisa Dupree, a forensic social worker at the Our Kids Center in Nashville, to testify about C.L.'s medical history that C.L. had given to former Our Kids employee Lorraine Gray. He contends that the testimony was inadmissible hearsay as a prior consistent statement used to bolster C.L.'s credibility. Defendant further asserts that the testimony was not admissible as an exception to the hearsay rule as being made for the purpose of medical diagnosis and treatment. Our Supreme Court has stated that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." *Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008) (citing *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992)). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the hearsay rule. Tenn. R. Evid. 802.

Rule 803(4) of the Tennessee Rules of Evidence provides that statements made for the purpose of medical diagnosis and treatment are admissible as an exception to the hearsay rule. Specifically, the Rule states that:

> [s]tatements made for the purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

Tenn. R. Evid. 803(4). Rule 803(4) is based upon the notion that statements made under conditions prescribed by the rule are presumptively trustworthy." *State v. McLeod,* 937 S.W.2d 867, 870 (Tenn. 1996).

At trial, C.L. testified concerning the incidents of sexual abuse by Defendant. On cross-examination, Defendant's counsel specifically asked C.L. what happened when she was examined at the hospital:

Q:      And you weren't truthful with the people at the hospital when you went and talked to them later on that same day; right?

A:      I don't feel that it was being untruthful. I just - I didn't lie about anything. I just told them what happened that night.

Q.      Well, do you recall them asking you if this was the only time that anything like this had happened?

A:      After I came from the hospital and I got interviewed by the detectives; not the hospital.

Q:      So you don't recall them asking you that same question too?

A:      No, sir.

Q:      So if they had a report that they did after this and they put in there that you told them this was the only time that it happened, you don't know why they would have put that in the report?

A:      I never said that it didn't happen. I said I don't remember.

Q:      Okay. So it might have been that you told the people at the hospital too, that this was the only time that it had happened?

A:      Yes, sir.

Ms. Dupree was later called to testify at trial. She testified that when a child is seen at the Our Kids Center, a medical history is taken "solely for the purposes of medical diagnosis and treatment." The defense objected to C.L.'s medical report arguing that it was testimonial in nature and should not be admitted. The trial court overruled the objection. C.L. reported to Ms. Gray that Defendant had put his mouth on her "private parts." C.L. indicated that Defendant had "swiped his hands by her genital area, but did not touch in her genital area with his hands[.]" Ms. Dupree testified that C.L. also said that approximately two months earlier, Defendant asked her to put her mouth on his private parts. C.L. then disclosed the conduct to the daughter of her foster mother's friend. Ms. Dupree testified that

C.L. indicated that her last menstrual cycle ended two days prior to the exam. There was some blood noted during the physical exam. Ms. Gray also documented that C.L. indicated that Defendant told C.L., "Don't do this, you don't want to leave don't go telling nobody this, you'll have to leave[.]"

The statements by C.L. to Ms. Gray were hearsay, and absent a relevant hearsay exception, were inadmissible. Here, as argued by the State, C.L.'s statements were taken in order to determine an appropriate medical diagnosis and/or treatment and therefore were admissible as a hearsay exception under Rule 803(4) of the Tennessee Rules of evidence.

Defendant seems to argue that C.L.'s medical history would be admissible only "when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness' statement was either fabricated or based upon faulty recollection." However, as previously noted, Defendant had challenged C.L. on cross-examination regarding her report to medical personnel previous to or during C.L.'s medical examination. When a defendant attacks the victim's credibility, the State may rehabilitate the witness by offering evidence of a prior consistent statement. In *State v. Joshua Brandon Tate*, No. M2011-02128-CCA-R3-CD, 2013 WL 3964122 (Tenn. Crim. App. July 31, 2013 ), this court stated:

> There are actually two circumstances in which a prior consistent statement of a witness is admissible: (1) where a prior consistent statement is allowed "to rebut the inference that the witness's testimony was a recent fabrication", *State v. Bush*, 942 S.W.2d 489, 516 (Tenn. 1997); and (2) when a witness's prior statement is used out of context to cross-examine the witness. *State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn. 1990). "The impeaching attack on the witness's credibility need not be successful for admissibility of a prior consistent statement." *State v. Albert R. Neese*, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App., at Nashville, Dec. 15, 2006), *perm. app. denied* (Tenn. April 23, 2007). More specifically, in *State v. Benton*, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988), this Court explained that a prior consistent statement is admissible:
>
> > [U]nder general evidentiary rules, . . ., as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

*See also Danny Ray Smith*, No. M2009-02275-CCA-R3-CD, 2011 WL 1432033, at \*14 (Tenn. Crim. App., at Nashville, Apr. 13, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011) (stating that prior consistent statements may be admissible to rebut the inference that the witness recently fabricated the testimony). It is important to note that properly admitted prior consistent statements are not hearsay because they are not offered for the truth of the matter asserted. *See State v. Livingston*, 907 S.W.2d 392, 398 (Tenn. 1995); *State v. Joseph Shaw, Jr.*, No. W2009-02326-CCA-R3-CD, 2010 WL 3384988, at \*7 (Tenn. Crim. App., at Jackson, Aug. 27, 2010), *perm. app. denied* (Tenn. 2011); *Albert R. Neese*, 2011 WL 1432033, at \*6; Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.01 [9] (6th ed. 2011).

*Joshua Brandon Tate*, 2013 WL 3964122, at \*7.

Based on our review, we conclude that the trial court did not err in allowing the admission of C.L.'s statements to Ms. Gray as testified to by Ms. Dupree concerning C.L.'s medical history. The testimony was properly admitted for the purpose of medical diagnosis and treatment and as a prior consistent statement to rebut Defendant's allegation that C.L.'s testimony was fabricated. Defendant is not entitled to relief on this issue.

E.     *Failure to Charge Attempted Rape as a Lesser-Included Offense of Rape*

Defendant argues that the trial court erred in failing to instruct the jury on attempted rape as a lesser included offense of rape. In *State v. Burns,* 6 S.W.3d 453 (Tenn. 1999), our Supreme Court concluded that an attempt to commit the charged offense is a lesser included offense of the charged offense. *Id.* at 467. Tenn. Code Ann. § 40-18-110(a) provides:

When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

We also note that absent a written request for an instruction on a lesser included offense the failure of the trial court to instruct the jury on the lesser included offense is not available as a ground for relief either in a motion for new trial or on appeal. T.C.A. § 40-18-110(c) (2012).

Our review of the record reveals that Defendant failed to file a written request asking the trial court to instruct the jury on the lesser included offense of attempted rape. However, the record contains the following exchange at trial:

| THE COURT: | All right. [Trial counsel], you had requested a charge? |
|---|---|
| [TRIAL COUNSEL]: | Yes, Your Honor. I requested that to each of the charged offenses and the lesser included offenses that are in the jury instruction, adding the charge of attempt of those different - - rape, sexual battery, statutory rape by an authority figure, and statutory rape - - based on our in-chambers conversation, I understand the Court is ruling that they're going to deny that at this time, based on State vs. Edwards. I would still request that that instruction be giv[en]. |
| THE COURT: | All right. Well, as I said, I'm guided by State v. Edwards, it's a September 2011 case, which essentially says that either the act was committed or it was not. Unless there was proof that there w[a]s some attempt made, then, attempt is not a part of the jury instructions. And I don't know of any evidence that said there was an attempt made. So, I am going to leave out the attempt on each of the Counts. All right. |

Since Defendant failed to file a written request for jury instructions prior to trial, this issue is waived on appeal unless it rises to the level of plain error. *State v. Page*, 184 S.W.3d 223, 226 (Tenn. 2006).

Even if "attempt" had been charged as a lesser-included offense, the jury would not have been permitted to consider it as an option to convict Defendant. The jury instructions are not included in the transcript. We assume, however, that the trial court properly charged

the jury pursuant to *State v. Davis*, 266 S.W.3d 896 (Tenn. 2008) wherein our supreme court held,

> We hold that, where a criminal defendant is entitled to jury instructions on lesser-included offenses, the trial court shall instruct the jury to consider the offenses in order from greatest to least within each count of the indictment and that it shall not proceed to consider any lesser-included offense until it has first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense.

*Davis*, 266 S.W.3d at 910.

The jury made a unanimous decision that Defendant was guilty of each offense as charged in the indictment. The jury was prohibited from considering any lesser offense. Accordingly, if error, the error was harmless beyond a reasonable doubt, and therefore not "plain error." Defendant is not entitled to relief on this issue.

F.     *Sentencing*

Defendant next contends that the trial court erred in sentencing him. More specifically, he states that the trial court failed to "comply with the purposes espoused in [Tenn. Code Ann. §] 40-35-103." Defendant argues that the trial court erred in its application of an enhancement factor and that the trial court erred in ordering his sentences to be served consecutively in Counts One and Three.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and

principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

We note that even a trial court's misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. Here, as enhancement factors, the trial court found that Defendant had a history of criminal convictions in addition to those necessary to establish the appropriate range and that the offense was committed to gratify the defendant's desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(1), (7). The trial court further found that Defendant abused a position of trust in that "he was there to look after this particular young lady at those particular times - at least, at most of the particular times." Tenn. Code Ann. § 40-35-114(14). Defendant correctly argues that application of enhancement factor (14) was inappropriately applied to the offense of statutory rape by an authority figure, where Defendant's position of authority is an element of the offense. However, application of factor (14) was appropriate for the offense of rape. Statutory rape by an authority figure was merged with the corresponding conviction of rape. The trial court properly sentenced Defendant to fifteen years for each offense, which was within the applicable range of punishment.

Defendant argues that the trial court improperly imposed consecutive sentencing. Our supreme court has recently held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations . . . if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v. James Allen Pollard*, ___ S.W.3d ___, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *7-9 (Tenn. Dec. 20, 2013). Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2), (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *James Allen Pollard* at *9 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal.")); *see also Bise*, 380 S.W.3d 705.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1)     The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2)     The defendant is an offender whose record of criminal activity is extensive;

(3)     The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. In this case, the trial court made the following findings concerning consecutive sentencing:

Now, with respect to 40-35 - - I believe it is 115, but let me - - 40-35-113 - - 115, excuse me. The Court, has to look at - - and subsection five, which states that: "The defendant is convicted of two or more statutory offense involving sexual abuse of a minor with consideration of aggravating circumstances arising from the relationship between the defendant and C.L.," et cetera. The Court believes that that does come into play. So, the Court is going to sentence him to two of the counts consecutive to one another and the third count concurrent, for an effective sentence of thirty years.

-33-

The records supports the trial court's finding due to the relationship of Defendant to the victim and Defendant's position of trust with the victim. The evidence at trial also suggested that the sexual abuse spanned a significant time frame.

We conclude that the sentencing decision was "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Defendant is not entitled to relief.

Accordingly, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE